**United States District Court**

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**NOT FOR CITATION OR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

HAROLD H. HAWKS,

           Petitioner,

  v.

JAMES HAMLET,

           Respondent.

_____/

No. C 04-01822 JSW

**ORDER DENYING PETITION
FOR WRIT OF HABEAS CORPUS**

**INTRODUCTION**

      Now before the Court is the petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 filed by Petitioner Harold H. Hawks ("Hawks"). Hawks does not contest his conviction or the resulting sentence. Rather, he seeks habeas relief based upon the denial of parole at his third suitability hearing. The petition is now ripe for consideration on the merits, and, for the reasons set forth below, the Petition will be DENIED.

**BACKGROUND**

**A.    Procedural History.**

      On May 4, 1987, Hawks was convicted by a jury of one count of murder in the second degree with the use of a firearm. (Answer, Ex. 1.) On June 2, 1987, Hawks was sentenced to an indeterminate sentence of fifteen years to life, with a two year enhancement as a result of the use of a firearm. (*Id.*) The California Department of Corrections and Rehabilitation received Hawks into custody on July 2, 1987, setting Hawks' minimum eligible parole date as November 28, 1997. (Petitioner's Appendix ("Pet. App.") A, Ex. C at 66.)

**United States District Court**

For the Northern District of California

1    The parole hearing at issue in this Petition is Hawks' third suitability hearing, which was held

2    on September 27, 2002 (the "September 2002 hearing").  At that hearing, the Board of Prison Terms

3    ("Board") found Hawks' unsuitable for parole and deferred a further hearing for a period of one year.

4    (Answer, Ex. 2 at 103:13-15.)[1]  On June 11, 2003, the California Supreme Court summarily denied

5    Hawks' state habeas petition, in which he challenged the denial of parole at the September 2002

6    hearing as well as the denial of parole at a hearing held on October 31, 2000 (the "October 2000

7    hearing").  (Pet. App. A, Ex. M.)  On May 7, 2004, Hawks timely filed the instant Petition

8    challenging the Board's denial of parole at the September 2002 hearing.  On December 29, 2004,

9    Respondent filed his Answer.  On April 4, 2005, Hawks filed his Traverse.

10    On May 31, 2005, the Court denied Hawks' motion to file a supplemental petition

11    challenging the Board's decision to deny him parole at a hearing held on November 19, 2003 (the

12    "November 2003 hearing").  The Board's decision to deny Hawks' parole at that hearing is the

13    subject of a separate petition currently pending before this Court in *Hawks v. Kane*, C-05-2583-JSW.

14    On August 24, 2005, the Court granted Respondent's motion for leave to file a supplemental

15    Answer, in which Respondent contended that California's parole scheme is not mandatory and that,

16    therefore, there is no federally protected liberty interest in parole.  In that Order, the Court granted

17    Hawks leave to file a supplemental Traverse addressing that issue, which Hawks filed on September

18    26, 2005.

19    **B.    Factual Background.**

20    The following facts are derived from the exhibits submitted in support of the parties'

21    pleadings in this case.  Although Hawks does not challenge his conviction, the facts underlying that

22    conviction are pertinent to the resolution of his habeas petition and are set forth as follows:

23

24    _____

25    [1]    The Board also found Hawks unsuitable for parole at hearings held on
         February 25, 1997 (the "February 1997 hearing") and the October 2000 hearing.  Respondent

26    contends that any claims related to Hawks' October 2000 hearing are barred by the statute of
         limitations, are moot, and are without merit.  (*See* Memorandum in Support of Answer

27    ("Resp. Mem.") at 24-30.)  Hawks does not seek habeas relief based on the October 2000
         hearing, and the Court therefore does not address these arguments.  (*See* Petitioner's Brief in

28    Support of Traverse ("Traverse Br.") at 51 n.26.)  Hawks also does not seek relief based on
         the February 1997 hearing.

**United States District Court**

For the Northern District of California

> On the night of August 22, 1986, the murder victim and her friend were riding in a van driven by the formers [*sic*] husband. They were on their way to Riverside on the 91 Freeway to take the couple's son, who had been injured earlier, to the hospital. Hawks, who was upset after a disagreement with his estranged wife, was driving on the same freeway with his two year old son when a ... "traffic dispute" arose between the driver of the van and Hawks. And the latter had become very upset when, as he claimed, the van cut him off, forcing him off to the median and one of it's [*sic*] occupants threw an empty soda can at his car. Hawks then reached into his back seat and retrieved his shotgun, which he loaded with a slug and then fired once. The slug pierced the side of the van, hit the victim in the chest, killing her, exiting her body and lodging in the throat of her companion.

(*See* Memorandum in Support of Petition ("Pet. Mem.") at 2 n.1; Answer Ex. 2 at 14:16-16:3.)[2]

At the February 1997 hearing, Hawks' initial parole suitability hearing, a panel of the Board found him unsuitable for parole and found that Hawks posed an unreasonable risk or danger to others if given a release date. The Board gave the following reasons for its decision:

> The first reason is the commitment offense which demonstrates a very callous disregard for the life and suffering of other human beings. It was carried out in a very dispassionate manner. ...
>
> We find that you've had a previous history of problems with alcohol. You were having some unstable relationships with your wife in particular during this period of time. And so those are also of concern to the panel.

(Pet. App. A, Ex. E at 166:8-167:12.) The Board did commend Hawks for his positive behavior while incarcerated: "You've remained disciplinary free. You've done a wonderful job of upgrading educationally and you've been doing very well, putting good use to your time." The Board, however, concluded that these favorable factors did "not outweigh those factors of unsuitability." (*Id.* at 167:6-12.) The Board deferred his next parole hearing for three years and recommended that Hawks remain disciplinary free, upgrade both vocationally and educationally, continue to participate in Alcoholics Anonymous, and continue to participate in therapy. (*Id.* at 167:25-168:14.) According to the record, Hawks followed the Board's recommendation to obtain more therapy. His request was denied because, in the view of the staff psychologist, "Inmate Hawks neither requires additional

---

[2]     At the September 2002 hearing, the Presiding Commissioner was reading the Statement of Facts from the appellate decision. (Answer Ex. 2 at 14:16-20.) Although not set forth in the Statement of Facts, the record in this case shows that the woman Hawks killed was a law enforcement officer. (*See, e.g., id.* at 98:23-26.)

psychotherapy nor do we have those resources available at this time." (Pet. App. A, Ex. B at 000050).

At the October 2000 hearing, the Board again found Hawks unsuitable for parole and again found that Hawks would pose an unreasonable risk of danger to society and a threat to public safety if released. The Board deferred his next hearing for two years. (*Id.*, Ex. F at 267:21-25.) The Board gave the following reasons for its decision:

> The commitment offense was carried out in an especially cruel manner. Multiple victims were attacked and injured. ... The offense was carried out in a manner which demonstrates exceptionally callous disregard for human suffering and the motive of the crime was inexplicable or at least very trivial in relation to the offense. ...
>
> In his parole plans, he does have — seem to have viable residential plans in the last county of legal residence. He does not have current proof of acceptable employment plans, although there are older letters in the file.
>
> And the hearing Panel notes that responses to PC 3042 notices indicate opposition to a finding of parole suitability, specifically from the District Attorney of Riverside County and also Correctional Counselor Madison writes that this inmate was a moderate degree of threat if released to the public.

(*Id.* at 264:12-265:14; *see also* Pet. App. Ex. C at 000058 (Life Prisoner Evaluation Report).)

The Board also considered a psychological report from Dr. Joe Reed, a staff psychiatrist, in which Dr. Reed opined that Hawks' "violence potential within a controlled setting is considered to be significantly below average relative to the level II inmate population." Dr. Reed also opined that Hawks' potential for violence would "be no more than the average citizen." (*Id.* at 200:22-201:19; *see also* Pet. App. A, Ex. B at 000048.) Dr. Reed also noted that Hawks stated that "he would attend more psychological groups if they were currently available at CTF." (Pet. App. A, Ex. B at 000047.) Finally, Dr. Reed noted in his report that Hawks "showed excellent insight into his poor anger control problem and alcohol abuse problem. He showed excellent empathy towards the damage done to the victims and seemed genuinely penitent for his crime." (*Id.* at 000048.)

Despite this report, the Board found that Hawks "does need therapy in order to face, discuss, understand and cope with stress in a nondestructive manner. He also needs to fully develop the causative factors, or ... more fully understand the causative factors which led to this crime and explore his full culpability in this crime, and until progress is made, the prisoner continues to be

unpredictable and a threat to others." (*Id.* at 265:25-266:7.)  The Board also noted that Hawks "does

not have a previous record.  Institutionally, he's done very well.  We'll mention that in detail, but he

has, in the determination of the Board, has not yet sufficiently participated in beneficial self-help and

therapy programming." (*Id.* at 265:7-13; *see also id.* at 266:7-16 (noting Hawks had been

disciplinary free for his entire period of incarceration and outlining specific positive actions taken).)

Although commending him for taking these positive steps, the Board again found the "positive

aspects of his behavior do not yet outweigh his factors of unsuitability." (*Id.* at 266:16-18.)  Thus,

the Board recommended that Hawks remain disciplinary free, continue to upgrade vocationally, and

to participate in whatever self-help and therapy programming in which he might be able to

participate.  (*Id.* at 267:24-268:4.)

On September 27, 2002, the Board conducted Hawks's third suitability hearing.  At that

hearing, the Board reviewed Hawks' disciplinary history and noted that he did not have a serious

disciplinary history while incarcerated.  Indeed, it stated that several correctional officers had

provided statements opining that Hawks would be an "excellent candidate for parole." (Answer, Ex.

2 at 44:17-20.)  Again, however, the Board found Hawks unsuitable for parole and denied

consideration for one year.  The Board's decision was relayed by Presiding Commissioner Munoz as

follows:

> [T]his Panel has decided on a one-year denial in your case.  We've reviewed
> all information received from the public and relied on the following
> circumstances in concluding that you are not suitable for parole.  And that
> you would pose an unreasonable risk of danger to society if released from
> prison at this time.  Many factors were considered.
>
> *First and foremost was the commitment offense and its nature.  This offense
> was carried out in a cruel manner with callous disregard for human
> suffering.*  Multiple victims were attacked and the van that was fired at
> contained at least four individuals.  One who – one was killed and one was
> severely injured.  And then, who's to say how many other citizens were
> exposed to danger, since there were quite possibly other vehicles on the road
> and other citizens in the immediate neighborhood.  The motive for this crime
> was trivial in relation to the offense.  These conclusions are drawn from the
> Statement of Facts, wherein the prisoner became involved in a situation that
> now is commonly referred to as a road rage situation.  He became involved
> with occupants of a van.  As a result, the inmate reached behind his seat
> where he was sitting, when he was driving his vehicle, grabbed the shotgun
> and then a round, known as a slug.  He loaded the shotgun, chased after the
> van, pulled up alongside it, and fired one round, with no regard to the safety
> of the occupants of the van or other people who might be nearby.  As a result

**United States District Court**

**For the Northern District of California**

of this senseless act, Victim Dwyer was killed, and victim Varga, severely injured. And this Panel feels the inmate is directly responsible for the demise of a human being.

*We note that the District Attorney from Riverside County is opposed to parole suitability and we also had three next of kin, the children of the victim, present via video teleconferencing, who stated their opposition to parole suitability for this inmate.*

This panel makes the following findings: *The inmate needs to continue with his self-help programming.* And also, the gains that he has exhibited while incarcerated are appreciated by this Panel and hopefully he'll stay on that path. We appreciate the number of things you have done while incarcerated. Your upgrading your education. [*sic*] Your completing at least two vocations. [*sic*] Presently, you're involved in another one. Your taking part in Life Skills and also, the 12-Step participation since 1990. [*sic*] However, these positive aspects of your behavior do not outweigh the factors of unsuitability.

(*Id.* at 103:14-105:20 (emphasis added).)

**GROUNDS FOR RELIEF**

Hawks raises two claims in his Petition. First, he asserts that the Board's decision to deny him parole at the September 2002 parole hearing violated his Due Process rights. Second, he asserts that the Board's decision to deny parole at the September 2002 hearing is "part of an unlawful pattern and practice of the Board to deny parole to virtually all inmates convicted of murder, irrespective of their accomplishments and efforts at rehabilitation ... ." (Petition at 26.) Hawks contends this alleged "policy violates' [his] rights to procedural due process equal protection of the laws under the 14th Amendment to United States Constitution." (*Id.* at 28.)

**ANALYSIS**

**A.    Standard of Review.**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a); *see also Rose v. Hodges*, 423 U.S. 19, 21 (1971). Because the petition in this case was filed after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), AEPDA's provisions apply. *Jeffries v. Wood*, 103 F.3d 827 (9th Cir. 1996) (en banc).

6

**United States District Court**

For the Northern District of California

1    Under AEPDA, this Court may grant the petition with respect to any claim that was

2   adjudicated on the merits in state court only if the state court's adjudication of the claim: "(1)

3   resulted in a decision that was contrary to, or involved an unreasonable application of, clearly

4   established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in

5   a decision that was based on an unreasonable determination of the facts in light of the evidence

6   presented in the State court proceeding."  28 U.S.C. § 2254(d); *see also Williams (Terry) v. Taylor*,

7   529 U.S. 362, 413 (2000) (hereinafter "*Williams*").  Courts are not required to address the merits of a

8   particular claim, but may simply deny a habeas application on the ground that relief is precluded by

9   28 U.S.C. § 2254(d).  *Lockyer v. Andrade*, 538 U.S. 63, 70-73 (2003).  It is the habeas petitioner's

10   burden to show he is not precluded from obtaining relief by § 2254(d).  *See Woodford v. Visciotti*,

11   537 U.S. 19, 25 (2002).

12    "Clearly established federal law, as determined by the Supreme Court of the United States"

13   refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of

14   the relevant state-court decision." *Williams*, 529 U.S. at 412; *Barker v. Fleming*, 423 F.3d 1085,

15   1093 (9th Cir. 2005) ("clearly established" federal law determined as of the time of the state court's

16   last reasoned decision); *Alvarado v. Hill*, 252 F.3d 1066, 1068-69 (9th Cir. 2001).  "Section

17   2254(d)(1) restricts the source of clearly established law to [the Supreme] Court's jurisprudence."

18   *Williams*, 529 U.S. at 412.  The Supreme Court has explained repeatedly that AEDPA, which

19   embodies deep-seated principles of comity, finality, and federalism, establishes a highly deferential

20   standard for reviewing state-court determinations.  *See id.* at 436.  Thus, that court has emphasized

21   that "[a] federal court may not overrule a state court for simply holding a view different from its

22   own, when the precedent from [the Supreme] Court is, at best, ambiguous." *Mitchell v. Esparza*,

23   540 U.S. 12, 17 (2003) (per curiam).

24    Under the "contrary to" clause of section 2254(d)(1), a federal court may grant the writ only

25   if the state court "applies a rule that contradicts the governing law set forth in [Supreme Court] cases,

26   'or if it confronts a set of facts that are materially indistinguishable from a decision'" of the Supreme

27   Court and nevertheless arrives at a different result." *Early v. Packer*, 537 U.S. 3, 8 (2002) (quoting

28   *Williams*, 529 U.S. at 405-06).  Under the "unreasonable application" clause of section 2254(d)(1), a

federal court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the prisoner's case. *Williams*, 529 U.S. at 413.

A federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 412. The objectively unreasonable standard is not a clear error standard. *Lockyer*, 538 U.S. at 75-76; *Clark v. Murphy*, 331 F.3d 1062, 1067-69 (9th Cir.), *cert. denied*, 540 U.S. 968 (2003). After *Lockyer*, "[t]he writ may not issue simply because, in our determination, a state court's application of federal law was erroneous, clearly or otherwise. While the 'objectively unreasonable' standard is not self-explanatory, at a minimum it denotes a greater degree of deference to the state courts than [the Ninth Circuit] ha[s] previously afforded them." *Clark*, 331 F.3d at 1068.

In determining whether the state court's decision is contrary to, or an unreasonable application of, clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson*, 217 F.3d 663, 669 n.7 (9th Cir. 2000). If the highest state court has summarily denied a petitioner's claim, the habeas court may "look through" that decision to the last state court addressing the claim in a reasoned decision. *See Shackleford v. Hubbard*, 234 F.3d 1072, 1079 n.2 (9th Cir. 2000) (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991)).

The standard of review under AEDPA is somewhat different where the state court gives no reasoned explanation of its decision on a petitioner's federal claim and where there is no reasoned lower court decision on the claim. In such a case, a review of the record is the only means of deciding whether the state court's decision was objectively reasonable. *See Hines v. Thompson*, 336 F.3d 848, 853 (9th Cir. 2003); *Greene v. Lambert*, 288 F.3d 1081, 1088 (9th Cir. 2002). Therefore, while a state court decision on the merits concerning a question of law normally should be afforded respect, "[i]f there is no such decision on the merits ... there is nothing to which to defer." *Greene*, 288 F.3d at 1089. In this case, there is no reasoned decision on the merits. (*See* Petition, App. A, Ex. M.) Accordingly, the Court has conducted an independent review of the record.

United States District Court

For the Northern District of California

**United States District Court**

For the Northern District of California

1    The Ninth Circuit has applied § 2254(d) to review of parole suitability decisions. *See Rosas*

2    *v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005) (per curiam); *see also McQuillion v. Duncan*, 306

3    F.3d 895, 901 (9th Cir. 2002) (assuming without deciding that AEDPA deferential standard of review

4    under section 2254 applies to such decisions).

5    **B.        Legal Standards Applicable to Parole Suitability Determinations.**

6        California's parole scheme is set forth in California Penal Code § 3041, *et seq.*  Section

7    3041(a) provides, in pertinent part:

8        In the case of any inmate sentenced pursuant to any provision of law ... [o]ne
         year prior to the inmate's minimum eligible parole release date a panel of two
9        or more commissioners or deputy commissions shall again meet with the
         inmate and shall normally set a parole release date as provided in Section
10       3041.5. ... The release date shall be set in a manner that will provide uniform
         terms for offenses of similar gravity and magnitude in respect to their threat
11       to the public, and that will comply with the sentencing rules that the Judicial
         Council may issue and any sentencing information relevant to the setting of
12       parole release dates.

13   Cal. Pen. Code § 3041(a).

14       Penal Code section 3041(b) provides in pertinent part:

15       The panel or board shall set a release date unless it determines that the gravity
         of the current convicted offense or offenses, or the timing and gravity of
16       current or past convicted offense or offenses, is such that consideration of the
         public safety requires a more lengthy period of incarceration for this
17       individual, and that a parole date, therefore, cannot be fixed at this meeting.

18   Cal. Penal Code § 3041(b).

19       Title 15 of the California Code of Regulations section 2402 (hereinafter "Section 2402") sets

20   forth the criteria for determining whether an inmate is suitable for release on parole.  The opening

21   paragraph of section 2402(a) states:

22       Regardless of the length of time served, a life prisoner shall be found
         unsuitable for and denied parole if in the judgment of the panel the prisoner
23       will pose an unreasonable risk of danger to society if released from prison.

24   15 Cal. Code Regs. § 2402(a).

25       Section 2402(b) of these regulations provides:

26       All relevant, reliable information available to the panel shall be considered
         in determining suitability for parole.  Such information shall include the
27       circumstances of the prisoner's social history; past and present mental state;
         past criminal history, including involvement in other criminal misconduct
28       which is reliably documented; the base and other commitment offenses,

9

including behavior before, during and after the crime; past and present attitude toward the crime; any considerations of treatment or control, including the use of special conditions under which the prisoner may safely be released to the community; and any other information which bears on the prisoner's suitability for release. Circumstances which taken alone may not firmly establish unsuitability for parole may contribute to a pattern which results in a finding of unsuitability.

*Id.* § 2402(b).

Circumstances tending to show unsuitability for parole are:

(1) Commitment Offense.   The prisoner committed the offense in an especially heinous, atrocious or cruel manner.   The factors to be considered include:

(A) Multiple victims were attacked, injured or killed in the same or separate incidents.

(B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.

(C) The victim was abused, defiled or mutilated during or after the offense.

(D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.

(E) The motive for the crime is inexplicable or very trivial in relation to the offense.

(2) Previous Record of Violence.   The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.

(3) Unstable Social History.   The prisoner has a history of unstable or tumultuous relationships with others.

(4) Sadistic Sexual Offenses.   The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.   The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior.   The prisoner has engaged in serious misconduct in prison or jail.

*Id.* § 2402(c).

Circumstances supporting a finding of suitability for parole are:

(1) No Juvenile Record.   The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

United States District Court

For the Northern District of California

10

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands that nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as a result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Woman Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Woman Syndrome, as defined in section 2000(b), and it appears the criminal behavior was a result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the possibility of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9)  Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

*Id.* § 2402(d).

The regulations also contain a matrix of suggested base terms depending on the murder degree and the circumstances surrounding the murder.  The matrix provides three choices of suggested base terms for several categories of crimes.  *See id.* § 2403.  For second degree murders, the matrix of base terms ranges from the low of 15, 16, or 17 years, to a high of 19, 20 or 21 years, depending on some of the facts of the crime.[3]

Although the matrix is to be used to establish a base term, an inmate's base term is set only when he or she has been found suitable for parole.  *See Dannenberg*, 34 Cal. 4th at 1087.  Thus, the

---

[3]     One axis of the matrix concerns the relationship between murderer and victim and the other axis of the matrix concerns the circumstances of the murder.  The choices on the axis for the relationship of murderer and victim are "participating victim," "prior relationship," and "no prior relationship."  The choices on the axis for the circumstances of the murder are "indirect," "direct or victim contribution," and "severe trauma."  Each of the choices are further defined in the matrix.  *See* 15 Cal. Code Regs. § 2403(c).

United States District Court

For the Northern District of California

1    statutory scheme places individual suitability for parole above a prisoner's expectancy in an early

2    setting of a fixed date designed to ensure term uniformity.  *Id.* at 1070-71.

3    > While subdivision (a) of section 3041 states that indeterminate life (i.e., life-
    > maximum) sentences should "normally" receive "uniform" parole dates for
4    > similar crimes, subdivision (b) provides that this policy applies "*unless* [the
    > Board] determines" that a release date cannot presently be set because the
5    > particular offender's crime and/or criminal history raises "*public safety*"
    > concerns requiring further indefinite incarceration. (Italics added.) Nothing
6    > in the statute states or suggests that the Board must evaluate the case under
    > standards of term uniformity before exercising its authority to deny a parole
7    > date on the grounds the particular offender's criminality presents a *continuing
    > public danger*.

8

9    *Id.* at 1070 (emphasis, brackets, and parentheses as in original).

10        In sum, "the Board, exercising its traditional broad discretion, may protect public safety in

11   each discrete case by considering the dangerous implications of a life-maximum prisoner's crime

12   individually."  *Id.* at 1071.  The California Supreme Court's determination of state law is binding in

13   this federal habeas action.  *See Hicks v. Feiock*, 485 U.S. 624, 629 (1988); *Sandstrom v. Montana*,

14   442 U.S. 510, 516-17 (1979).

15        The California Supreme Court also has determined that the facts of the crime can alone

16   support a sentence longer than the statutory minimum even if everything else about the prisoner is

17   laudable.  "While the board must point to factors beyond the minimum elements of the crime for

18   which the inmate was committed, it need engage in no further comparative analysis before

19   concluding that the particular facts of the offense make it unsafe, at that time, to fix a date for the

20   prisoner's release."  *Dannenberg*, 34 Cal. 4th at 1071; *see also In re Rosenkrantz*, 29 Cal. 4th 616,

21   682-83 (2002), *cert. denied*, 538 U.S. 980 (2003) ("[t]he nature of the prisoner's offense, alone, can

22   constitute a sufficient basis for denying parole" but might violate due process "where no

23   circumstances of the offense reasonably could be considered more aggravated or violent than the

24   minimum necessary to sustain a conviction for that offense").

25   //

26   //

27   //

28   //

**C.      The Board's Decision to Deny Hawks Parole Did Not Violate His Due Process Rights.**

Hawks asserts that the Board's decision to deny him parole at the September 2002 hearing violated his due process rights.[4]  "In analyzing the procedural safeguards owed to an inmate under the Due Process clause, [a court] must look to two distinct elements: (1) a deprivation of a constitutionally protected liberty or property interest, and (2) a denial of adequate procedural safeguards." *Biggs v. Terhune*, 334 F.3d 910, 913 (9th Cir. 2003).  The second prong of this test is satisfied if (1) the inmate has been afforded an opportunity to be heard and, if denied parole, informed of the reasons underlying the decision and (2) "some evidence" supports the decision to grant or deny parole.  *See Jancsek v. Oregon Bd. of Parole*, 833 F.2d 1389, 1390 (9th Cir. 1987).

**1.      Hawks Has a Federally Protected Liberty Interest in Parole.**

Respondent contends in his Supplemental Answer that Hawks has no federally protected liberty interest in parole and, for that reason, asks that the Court deny the Petition.  In general, "[t]here is no constitutional or inherent right of a convicted person to be conditionally released before the expiration of a valid sentence." *Greenholtz v. Inmates of Nebraska Penal and Corr. Complex*, 442 U.S. 1, 7 (1979).  However, "a state's statutory scheme, if it uses mandatory language, 'creates a presumption that parole release will be granted' when or unless certain designated findings are made, and thereby gives rise to a constitutional liberty interest." *McQuillion*, 306 F.3d at 901 (citing *Board of Pardons v. Allen*, 482 U.S. 369, 377-78 (1987); *Greenholtz*, 442 U.S. at 12).

As set forth above, California's parole statute provides, in pertinent part, that "[t]he panel or the board, sitting en banc, *shall* set a release date *unless* it determines that the gravity of the current convicted offense or offense ... is such that consideration of the public safety requires a more lengthy period of incarceration for this individual and that a parole date, therefore, cannot be fixed[.]"  Cal. Pen. Code § 3041(b) (emphasis added).  This "shall-unless" language is similar to the statutes that

---

[4]      Hawks also theorizes that the Board breached a contract with him and contends that this breach also violates his Due Process rights.  Hawks analogizes his situation to a case where, as part of a plea bargain, the parties agreed the defendant would be released after serving a specified prison term if the defendant's conduct in prison was disciplinary free.  (*See* Pet. Mem. at 41 (citing *Brown v. Poole*, 337 F.3d 1155 (9th Cir. 2003).)  The Court finds *Brown* to be inapposite to this case and, to the extent Hawks seeks relief on this basis, his Petition is DENIED.

United States District Court

For the Northern District of California

United States District Court

For the Northern District of California

were at issue in *Allen* and *Greenholtz*. *See Allen*, 482 U.S. at 376 ("*Subject to the following restrictions*, the board *shall* release on parole ... any person confined in the Montana state prison or the women's correction center ... when in its opinion there is reasonable probability that the prisoner can be released without detriment to the prisoner or the community.") (quoting Mont. Code Ann. § 46-230201 (1985)) (emphasis added and in original); *Greenholtz*, 442 U.S. at 11 ("[w]henever the Board of Parole considers the release of a committed offender who is eligible for release on parole, it *shall* order this release *unless* it is of the opinion that his release should be deferred...") (quoting Neb. Rev. Stat. § 83-1,114(1) (1976)) (emphasis added).

Recognizing the similarity between California's statutory scheme and the statutory scheme at issue in *Allen* and *Greenholtz*, the Ninth Circuit has held that "California's parole scheme gives rise to a cognizable liberty interest in release on parole. The scheme creates a presumption that parole release will be granted unless the statutorily defined determinations are made." *McQuillion*, 306 F.3d at 902 (internal quotations and citations omitted). The court reiterated that holding in *Biggs*, when it stated that "it is clear that 'California's parole scheme gives rise to a cognizable liberty interest in release on parole.'" 334 F.3d at 914 (quoting *McQuillion*, 306 F.3d at 902).

Respondent contends that the California Supreme Court's decision in *Dannenberg*, *supra*, undermines the Ninth Circuit's holdings in *Biggs* and *McQuillion* and relies in part on *Sass v. California Board of Prison Terms*, 376 F. Supp. 2d 975 (E.D. Cal. 2005) in support of this argument. This Court disagrees with the *Sass* court's conclusion that the holding in *Dannenberg* clearly demonstrates California's parole scheme is not mandatory. The issue presented in *Dannenberg* was whether the Board was required to set uniform parole dates under Section 3041(a) before it determined whether a particular inmate was suitable for parole under 3041(b). *See Dannenberg*, 34 Cal. 4th at 1069, 1077. It concluded the answer to that question was no. *Id.* at 1096. However, the *Dannenberg* court used language throughout the opinion that suggests it presumed an inmate retained a protected liberty interest in the possibility of parole. *See, e.g., id.* at 1094 (noting continued reliance on commitment offense "might thus also contravene the inmate's constitutionally protected expectation of parole") and at 1095 n.16 ("well established principles" regarding parole discretion with deferential judicial oversight "define and limit the *expectancy* in parole from a life

14

sentence *to which due process interests attach*") (emphasis added).  Furthermore, California courts addressing the issue post *Dannenberg* continue to assume a protected liberty interest exists.  *See In re Scott*, 133 Cal. App. 4th 573 (2005); *In re DeLuna*, 126 Cal. App. 4th 585 (2005).

This Court finds itself in agreement with those courts that have considered the impact of *Dannenberg* on the issue of whether an inmate incarcerated in California has a federally protected liberty interest in parole and that have concluded a liberty interest exists.  *See, e.g., Blankenship v. Kane*, 2006 WL 515627 at *3 (N.D. Cal. Feb. 28, 2006) (citing cases).  Accordingly, under the holdings of *McQuillion* and *Biggs*, Hawks has a federally protected liberty interest in parole, and the Petition shall not be denied on that basis.

### 2.     The Board's Decision Was Supported by Some Evidence.

Having determined that Hawks has a federally protected liberty interest in parole, the Court turns to the question of whether he received adequate procedural protections.  *Biggs*, 334 F.3d at 913.  Hawks does not contend that he was not provided an opportunity to be heard or that the Board did not provide its reasons for denying parole.  Accordingly, the Court looks only to whether there is "'some evidence' having 'some indicia of reliability'" to support the Board's decision.  *McQuillion*, 306 F.3d at 904 (adopting "some evidence standard for disciplinary hearings outlined in *Superintendent v. Hill*, 472 U.S. 445 (1985)); *see also Biggs*, 334 F.3d at 915.  The Board's decision must also reflect consideration of each inmate's particular circumstances.  *See, e.g., Rosenkrantz*, 29 Cal. 4th at 677 (Board's decision "must reflect an individualized consideration of the specified criteria and cannot be arbitrary and capricious").

The Supreme Court has explained that compliance with the "some evidence" standard "does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence."  *Hill*, 472 U.S. at 455.  Rather, the Court is required only to determine whether there is any evidence in the record that could support the Board's decision.  *Id.* at 445.  Further, "[t]he nature of the prisoner's offense, alone, can constitute a sufficient basis for denying parole."  *Rosenkrantz*, 29 Cal. 4th at 682.  The Board, however, "must point to factors beyond the minimum elements of the crime for which the inmate was committed."  *Dannenberg*, 34 Cal. 4th at 1071.

**United States District Court**

For the Northern District of California

1    Hawks contends that the Board's decision to find him unsuitable for parole is not supported

2    by some evidence.  As set forth above, at the September 2002 hearing, the Board found Hawks'

3    unsuitable for parole and an unreasonable risk or danger to others if released based on (1) the nature

4    of the commitment offense, (2) the fact that the victims' next of kin and the District Attorney

5    opposed release, and (3) that Hawks needed to continue with self-help programming.

6                    **a.    The nature of the offense.**

7    The only Section 2042 factor on which the Board relied in finding Hawks unsuitable is that

8    he "committed the offense in an especially heinous, atrocious or cruel manner."  15 Cal. Code Regs.

9    § 2402(c)(1).  The Board cited the following three factors in support of its determination that "first

10   and foremost" Hawks' crime was committed in an "especially heinous, atrocious or cruel manner:"

11   (1) the offense was carried out in a cruel manner with callous disregard for human suffering, (2)

12   multiple victims were attacked; and (3) the motive for the crime was trivial in relation to the offense.

13   (Answer, Ex. 2 at 103:22-104:8.)  The Board drew its factual support for these conclusions from the

14   Statement of Facts contained within the appellate court's decision affirming Hawks' conviction.  (*Id.*

15   at 104:8-10.)

16   It is undisputed that multiple victims were involved and that one was critically injured and

17   one was killed.  (*Id.* at 14:16-16:3.)  It also is undisputed that Hawks consumed "[s]omewhere

18   between six and eight beers," before getting into the van with his two year old son.  (*Id.* at 21:17-22.)

19   In addition to having consumed alcohol, Hawks acknowledged that he was angry as a result of an

20   argument he had with his estranged wife.  (Answer, Ex. A at 15:9-19, 21:2-18.)  At his hearing,

21   Hawks stated that during the altercation with the driver of the van in which the victims were riding,

22   he was run off the road into the median and that his child was dislodged from his car seat.  (*Id.* at

23   21:7-11.)  Instead of letting the matter drop at that point, Hawks "got the car back under control,

24   back in the fast lane again, and I tried to catch up with the van."  (*Id.* at 11-14.)  While he was still

25   driving, Hawks then reached around and loaded his gun with what turned out to be a slug and shot at

26   and pierced the van.  Although Hawks may have intended only to scare the driver of the van with a

27   warning shot, his shot pierced the van and killed one woman and severely injured another.  (*Id.*)

28   Even if the Board erred in concluding that the manner in which the offense was committed showed

16

**United States District Court**

**For the Northern District of California**

an exceptionally callous disregard for human suffering, these facts do support the Board's findings that multiple victims were attacked and that the motive for the crime was trivial in relation to the offense. As such, the Board's conclusion that the offense was committed in "an especially heinous, atrocious or cruel manner," and its decision to deny parole by relying on the facts of the crime is based on some evidence.

**b.     Opposition to Release from Next of Kin and District Attorney.**

The Board also denied Hawks' parole based upon the fact that the District Attorney and Ms. Dwyer's next of kin opposed parole. California Penal Code section 3043 provides:

> The Board, in deciding whether to release the person on parole, shall consider the statements of the victim or victims, next of kin, immediate family members of the victim, and the designated representatives of the victim or next of kin, if applicable, made pursuant to this section and shall include in its report a statement of whether the person would pose a threat to public safety if released on parole.

Cal. Pen. Code § 3043(e).

In addition, the Board is required to give notice to the

> district attorney of the county in which the offense was committed, the law enforcement agency that investigated the case, and where the prisoner was convicted of the murder of a peace officer, the law enforcement agency which had employed that peace officer at the time of the murder.

*Id.* § 3042(a).

Although the fact that the next of kin or the District Attorney may oppose release is not listed in the regulations regarding suitability and unsuitability, the provisions of the Penal Code require the Board to consider statements given by such officials or persons when it renders a decision on an inmate's suitability, or lack thereof, for parole. *Id.* § 3046(c); *see also Dannenberg*, 34 Cal. 4th at 1084-85 (noting that "obvious purpose of these statutes is to guarantee that the Board has fully addressed the public safety implications of releasing *each individual life-maximum inmate* on parole *before it decides to do so*") (emphasis in original). The record supports the Board's conclusion that the District Attorney and the next of kin opposed parole. (*See* Answer, Ex. 2 at 73:15-76:9, 93:24-101:21.) Consequently, the Board's decision to deny parole relying on that opposition is supported by some evidence.

17

**United States District Court**

For the Northern District of California

1

**c.      Need for continued self-help programming.**

2        The Board also determined that Hawks needed to continue with therapy and self-help

3   programming.  The Court concludes that this aspect of the Board's decision is not supported by some

4   evidence.  Hawks began participating in therapy in 1992 and has done so throughout his term of

5   incarceration.  By September 2002, Hawks had successfully completed two Life Skills courses,

6   dealing with substance abuse, victim awareness, overcoming anger and aggression, and stress

7   management with Dr. Halliman, an Impact Workshop, a self-help providing education and awareness

8   as to the profound negative impact of crime on its victims, an Anger Management course associated

9   with the Muslim Development Center, a certificate from Women's Crisis Center, a Father's group

10  with Dr. Fishback, and continuously participated in AA/NA 12-Step Programs for twelve years.  (*See*

11  Answer, Ex. 2 at 38:7-49:23; *see generally* Pet. App. A, Exs. A, B, D, and J.)  Indeed, the Counselor

12  who prepared the report in anticipation of the September 2002 hearing concluded that Hawks was "a

13  low degree of threat to the public at this time, if released from prison."  (Answer, Ex. 2 at 50:4-10.)

14        Furthermore, Staff Psychologist Bakeman twice has rejected Hawks's request for more self-

15  help therapy, once after a similar recommendation at the February 1997 parole hearing, and once

16  after the October 2000 parole hearing, noting that "Inmate Hawks has requested additional

17  psychotherapy as mandated by the Board of Prison Terms (BPT).  Inmate Hawks neither requires

18  additional psychotherapy nor do we have those resource available at this time." (Pet. App. A, Ex. B

19  at 000050.)  Additionally, those persons evaluating Hawks's psychological progress consistently

20  have noted the increased insight, increased empathy, and general gains he has made through therapy.

21  (*See id.* at 000048, 000052-53)  Dr. Reed found that Hawks "showed excellent insight into his poor

22  anger control problem and alcohol abuse problem.  He showed excellent empathy towards the

23  damage done to the victims and seemed genuinely penitent for his crime."  (*Id.* at 000048.)  The

24  Court finds that the Board's finding that Hawks requires more self-help programming and therapy is

25  not supported by some evidence.

26        However, notwithstanding the fact that this last finding is not supported by some evidence,

27  the Board's reliance on the nature of the crime and the opposition from the next of kin and the

28  District Attorney provided a sufficient basis to deny parole under California law.  For that reason, the

18

Board's decision to deny parole is not devoid of the quantum of some evidence required to satisfy due process. Accordingly, the California Supreme Court's rejection of Hawks' due process claim did not result in a decision that was contrary to or involve an unreasonable application of clearly established federal law, nor was it based on an unreasonable determination of the facts in light of the record. 28 U.S.C. § 2254(d)(1),(2).

### 3. The Concerns Outlined in *Biggs* Do Not Arise in Hawks' Case.

The Court's determination that the Board's decision to deny parole was supported by some evidence does not end the Court's inquiry because, in *Biggs*, the Ninth Circuit held that the some evidence standard may be considered in light of the Board's decision-making process over time. In *Biggs*, the Ninth Circuit addressed a habeas petition from Biggs in which he challenged denial of parole at his first suitability hearing, despite his record as a model prisoner. 334 F.3d at 912-13. Biggs was serving a sentence of twenty-five years to life following his conviction in 1985 for first degree murder. Although the Ninth Circuit rejected several of the reasons given by the Board for finding Biggs unsuitable for parole, it upheld three: (1) the commitment offense involved the murder of a witness, (2) the murder was carried out in a manner exhibiting a callous disregard for the life and suffering of another, and (3) Biggs could benefit from therapy. *Id.* at 916. The court also noted that the Board's decision "is one of 'equity and requires a careful balancing and assessment of the factors considered," and that "in the present instance, the parole board's sole supportable reliance on the gravity of the offense and conduct prior to imprisonment to justify denial of parole can be initially justified as fulfilling the requirements set forth by state law." *Id.* at 917. The court, therefore, concluded that Biggs' due process rights had not been violated. *Id.* at 917.

The Ninth Circuit also stated that:

> [o]ver time, however, should Biggs continue to demonstrate exemplary behavior and evidence of rehabilitation, denying him a parole date simply because of the nature of his offense would raise serious questions involving his liberty interest. ...
>
> A continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation.

United States District Court

For the Northern District of California

*Id.* at 916-17; *cf. Dannenberg*, 34 Cal. 4th at 1094 ("sole reliance on the commitment offense might, in particular cases, violate" section 3041(a)'s "provision that a parole date 'shall normally be set' under 'uniform term principles, and might thus also contravene the inmate's constitutionally protected expectation of parole").

In issuing this note of caution, the Ninth Circuit gave no guidance to district courts as to how they should evaluate such a claim; nor has the Ninth Circuit provided any further guidance since it decided *Biggs.* District courts addressing the issue after *Biggs* also have not delineated a bright-line rule for determining when repeated denials of parole violate an inmate's due process rights. However, if a petitioner is denied parole at his or her first parole hearing, courts have concluded that the concerns raised in *Biggs* are not implicated. *See, e.g., Rosas v. Nielsen*, 428 F.3d 1229, 1232 (9th Cir. 2005) (finding that denial of parole at first suitability hearing based, in part, on circumstances of offense was supported by some evidence). Similarly, courts have found no due process violation when, although there have been multiple hearings, the due process challenge is raised in response to the first time the Board's decision relies solely on the facts of the commitment offense. *See, e.g., Hudson v. Kane*, 2005 WL 2035590, *9-10 (N.D. Cal. Aug. 23, 2005) (denial of parole at third parole hearing, but first denial based solely on the commitment offense); *cf. Machado v. Kane*, 2006 WL 449146 at *5-6 (N.D. Cal. Feb. 22, 2006) (although construing *Biggs* court's statements regarding continued reliance on unchanging factors as dicta, finding no due process violation where petitioner did not demonstrate he was denied parole repeatedly based on unchanging factors).

In contrast, in cases where the petitioner has had multiple parole suitability hearings over a long period of time and there were repeated denials of parole based solely on unchanging factors, courts have found a violation of due process and entitlement to relief under *Biggs.* *See, e.g., Irons v. Carey*, 358 F. Supp. 2d 936, 947 (2005) (finding due process violation in denial of parole at fifth parole suitability hearing after petitioner had served sixteen years of seventeen years to life sentence for second degree murder and met circumstances tending to indicate suitability for parole), *appeal docketed*, No. 05-15275 (9th Cir. Feb. 17, 2005); *Johnson v. Finn*, 2006 WL 195159, *12 (E.D. Cal. Jan. 19, 2006) (finding due process violation in Governor's determination to reverse Board's decision finding petitioner suitable for parole, where reversal was made after twelfth parole

suitability hearing and after petitioner had served twenty-four years of sentence of life with the possibility of parole and met circumstances tending to indicate suitability for parole), *report and recommendation adopted* 2006 WL 2839910 (E.D. Cal. Sept. 29, 2006); *Masoner v. State*, No. 2004 U.S. Dist. LEXIS 9221 (C.D. Cal. Jan. 23, 2004) (finding due process violation based on Board's "continued reliance" on pre-conviction factors to justify denial of parole suitability after petitioner had served twenty-one years of fifteen years to life sentence for second degree murder, had participated in therapy and self-help programming and had impeccable prison record).

The Court finds that Hawks' case here more closely resembles the facts of *Biggs* than it does of those cases where courts have found a due process violation. The instant petition challenges Hawks' third suitability hearing, which occurred when Hawks only had served approximately fifteen years of his sentence, which as noted was fifteen years to life, with a two year enhancement. It *is* beyond dispute that Hawks has exhibited exemplary behavior and has shown evidence of rehabilitation while incarcerated. He has demonstrated a commitment to remaining sober and has participated in Alcoholics Anonymous since 1990, and Hawks continues to seek out programming and therapy opportunities to the extent they are available to him. While incarcerated Hawks has completed vocational certificates for Data Processing and Computer Repair and also has completed an Associate of the Arts Degree from Hartnell College, a Bachelor's degree from Indiana University, and a Master's degree from California State University Dominguez Hills. (Pet. App. A, Ex. D.)

However, although the Board has relied on the nature of the offense three times as a basis to find Hawks' unsuitable for parole, it has not yet relied *solely* on that unchanging fact to deny Hawks' parole. At the first hearing, the Board relied on Hawks's prior alcohol problem and unstable relationship with his wife, in addition to the commitment offense. At the second hearing, the Board relied on Hawks's failure to fully participate in self-help programming, his lack of remorse, and his lack of parole plans, in addition to the commitment offense. (Pet. App. A, Ex. E at 166:8-168:14, Ex. F at 264:6-268:4.) Finally, at the hearing at issue in this petition, the Board relied on the opposition it received from the victims' next of kin and the District Attorney, as the Board is

United States District Court

For the Northern District of California

1   required to do by statute.  Cal. Pen. Code §3043(e).  Although the District Attorney and the victims

2   have continued to oppose parole for Mr. Hawks, their opposition is not an immutable factor.[5]

3          Therefore, although the Court can envision that at some point in the future, the facts of

4   Hawks' case may resemble more closely those cases where habeas relief has been granted, at this

5   time, the Court concludes that the Board's decision to deny parole at the September 2002 hearing did

6   not violate his federal due process rights.  Accordingly, the California Supreme Court's rejection of

7   Hawks' due process claim did not result in a decision that was contrary to or involved an

8   unreasonable application of clearly established federal law, nor was it based on an unreasonable

9   determination of the facts in light of the record.  28 U.S.C. § 2254(d)(1),(2).

10  **D.      Equal Protection Claim.**

11         The Fourteenth Amendment states that "[n]o state ... shall deny to any person within its

12  jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV.  This clause requires that

13  "all persons similarly circumstanced shall be treated alike."  *F.S. Royster Guano Co. v. Virginia*, 253

14  U.S. 412, 415 (1920).  Hawks also contends that the Board's decision to deny him parole at the

15  September 2002 hearing violates his equal protection rights because the decision reflects "an

16  unlawful pattern and practice of the Board to deny parole to virtually all inmates convicted of

17  murder, irrespective of their accomplishments and efforts at rehabilitation."[6]  (Petition at 26.)  Hawks

18  concedes that he is not a member of a protected class.  (Pet. Mem. at 54.)  Rather, he bases his equal

19  protection claim based on the denial of "a fundamentally protected right, [his] liberty interest."  (*Id.*)

---

21         [5]      To the extent the victims' next of kin and the District Attorney's opposition is
22  based solely on the nature of Hawks' offense, which will never change, the Board's
    continuing reliance on that opposition to deny Hawks' parole may pose the same problems
    continued reliance on the nature of the offense does, and that factor will cease to lack any
23  predictive value with respect to Hawks' future criminality.  *See, e.g, Irons*, 358 F. Supp. 2d at
    947 n.2.

25         [6]      It appears to this Court that Hawks conflates his equal protection argument
    with the argument that the Board's alleged no parole policy violates his due process rights to
    have an individualized consideration of his suitability.  This view is supported by Hawks'
26  decision not to pursue an equal protection claim in his petition challenging the denial of
    parole at his November 19, 2003 hearing, *Hawks v. Kane*, C-05-2853-JSW, and his statement
27  opposing the Respondent's motion to dismiss in that case that "references to the Board and
    Governors [*sic*] erratic treatment of similar cases is offered for the purposes of establishing
28  the arbitrary nature of the parole process in California."  (*Hawks v. Kane*, C-05-2853 JSW,
    Opposition to Motion to Dismiss at 9.)

However, to succeed on this claim, Hawks must be able to demonstrate that he was treated differently from similarly situated prisoners and show that the Board lacked a rational basis for its decision. *See, e.g., McGinnis v. Royster*, 410 U.S. 263, 269-70 (1973). Hawks, however, has not shown that other inmates convicted of second-degree murder have been granted parole when he has not.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. A separate judgment shall issue, and the Clerk shall close the file.

**IT IS SO ORDERED.**

Dated: November 1, 2006

_____
JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE

**United States District Court**

For the Northern District of California